1  GARY S. CASSELMAN, SBN 81658
   DANIELLE CASSELMAN, SBN 170622
2  LAW OFFICES OF GARY S. CASSELMAN
   3415 South Sepulveda Blvd., Suite 100
3  Los Angeles, CA 90034
   Phone: 310/314-4444  Fax 310/314-4447
4
5  Attorneys for Plaintiffs
6
7
8              UNITED STATES DISTRICT COURT
9             CENTRAL DISTRICT OF CALIFORNIA
10

| 11 | B R U C E    D O U G H E R T Y ,<br>JONATHAN DOUGHERTY | ) | CASE NO. CV 08-1149 PA (CTx) |
| 12 | | ) | **(The Honorable Percy Anderson, Judge, United States District Court)** |
| 13 | Plaintiffs, | ) | |
| 14 | vs. | ) | **DECLARATION OF BRUCE DOUGHERTY IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| 15 | CITY OF COVINA, ROBERT "ROB" BOBKIEWICZ, KIM RANEY, GLORIA CORTEZ, | ) | |
| 16 | NORMAN KIRSCHENBAUM, DOES 1through 10, | ) | DATE:      June 8, 2009<br>TIME:      1:30 P.M. |
| 17 | | ) | CTRM:      15 |
| 18 | Defendants. | ) | Case Filed:  February 20, 2008 |

19
20      BRUCE FREDERICK DOUGHERTY declares:
21  1.    Each fact set forth herein is within my personal knowledge and, if called upon
22        to testify, I could and would competently swear to each such fact.
23  2.    I am the plaintiff in this action against the School District Defendants Gloria
24        Cortez and Norman Kirschenbaum.  I am also plaintiff with my son Jonathan
25        Dougherty in a separate but related action against the Covina Police
26        Department, Case No. CV-08-7114 PA (CTx), which sets forth  claims for
27        violations the Fourth Amendment, arising from the unlawful execution of a
28        search warrant in my house.

3.   I am a fully credentialed, tenured school teacher of many years.  I hold a master's degree in English as a Second Language (ESL) and have taught every grade from kindergarten to high school, except first grade, plus some college courses and adult education

4.   During my career, and often while at the Charter Oaks Unified School District, I was often engaged in activism in promoting educational opportunities and programs for the disenfranchised students at Royal Oak Intermediate School.

5.   I spoke out about their lack of resources such as books, teaching materials, adequate classroom facilities and inadequate programs.

6.   For the assistance of the court, a graphic timeline is submitted as Exhibit A to reference the significant events and their relationship to others herein.

7.   The administration's apparent lack of concern in addressing these inequalities was something I made known in advocating for the students once I became tenured in Spring 2004.  This was especially when it came to the educational rights of students who did not speak English and required extraordinary resources to assimilate into the English speaking curriculum.

8.   I was actively involving in teaching language acquisition and was vocal about any student who reached middle school, still unable to read.  I sought to create programs for their benefit, even if it would mean more (uncompensated) work.

9.   In September of 2002 I was hired by the Charter Oaks School District as a credentialed ESL teacher–with a Master's Degree in ESL[1]–and helped the school district meet its credential certification reviews in 2003.

10.  I received positive evaluations for the 2002-2003 and 2003-2004 school years. These evaluations resulted in being granted tenured status.

11.  Commencing in 2004, I spoke out and alerted District Management to great deficiencies in the District's ESL program, which included lack of proper

---

[1] To my knowledge, I am the only ESL teacher in the District with a Master's Degree in ESL.

- 2 -

1      facilities and lack of materials, both highly prejudicial to teachers and students.

2  12.    In May 2004, along with about half the District's teachers, I received a pink

3        slip indicated that my employment would be terminated.

4  13.    Certain subject areas were not pink-slipped, for instance, math. I felt the

5        disenfranchised students needed a highly qualified ESL teacher to accomplish

6        their important assimilation into the mainstream of education. The proposed

7        lay-off threat would further handicap the ESL program, already lacking

8        sufficient qualified personnel. With a Masters degree in ESL, I was one of the

9        few uniquely qualified teachers in that area.

10  14.    At a well-attended labor hearing in May 2004, layoffs were the main item of

11        discussion. The meeting was attended by Gloria Cortez, representing the

12        District. I publicly explained that ESL was extremely important and with my

13        qualifications, I should be exempt from being laid off.

14  15.    In July of 2004, I was notified that I had obtained tenured status as a teacher.

15  16.    In August 2004, I met with new principal Barbara Aguilar to discuss my

16        suggestions for much needed improvement in the ESL program. They were not

17        well received as evidenced by my removal from the ESL program two weeks

18        later, then reassigned to teach 6th grade science and English – not ESL.

19  17.    I was due to receive an evaluation from principal Aguilar in October of 2004

20        and then again in April of 2005, but I did not receive either one. These

21        biannual evaluations are required by the collective bargaining agreement

22        between the District and the teacher's union.

23  18.    In May 2005, a "no confidence" petition regarding Principal Aguilar was

24        circulated by a group of teachers (which I did not circulate or sign) at Royal

25        Oak Intermediate School. I briefly read it, but decided not to sign it because

26        I did not believe in going after someone's job. In hindsight, I was in error.

27  19.    Although I did not sign the petition, I was apparently identified as one of the

28        signatories. I noticed that Principal Aguilar was noticeably cool to me

thereafter.  She had always been cordial to me before.  The petition angered Superintendent Kirschenbaum, who had hired and sponsored and continued to support Mrs. Aguilar despite her poor performance as an administrator.

20.  An unsettled question at or about that time was what type of schedule would be approved by teachers' vote for the following academic year.  The administration could call the vote at any time they desired.

21.  Which type of lesson plan will be in effect is very important to teachers because they have to prepare a lesson plan which varies greatly from one type of scheduling plan to another.

22.  If one option, "block scheduling" was selected, then double classroom periods (with longer lessons) would result for given subjects.  A master schedule could not be made for the following academic year because the administration had not submitted the question to a vote.  It appeared that the administration was delaying the vote to secure more support for the plan they preferred.

23.  This undecided situation was detrimental to the teachers and would adversely affect the students. During the current year, many students sat out certain periods in the library because of a poorly planned master schedule which did not provide them with any class to attend during certain periods – for about 8 weeks.  Had it become known outside the District, this might have impaired funding for the District.

24.  I did not want to see a repeat of the problems of the current academic year due to another poorly planned master schedule.  Students would not be forced to sit in a classroom or library with no academic instruction.

25.  I sought an immediate vote to require the administration to commit to a plan for the upcoming school year.  I had no intent to attack Principal Aguilar.

26.  However, circulating so close in time to the "no confidence" petition, my attempt to resolve the uncertainty may have seemed like another attack on her.

27.  Mrs. Aguilar's secretary, Heidi Kurtz, informed me that when she handed the

petition to her, Mrs. Aguilar exclaimed "who does Mr. Dougherty think he is? I am the Principal, I run this school."

28. In October of 2005, I received the first negative evaluation of my career, which came about after a single minimal evaluation of my 6th grade "personal finance" class. The evaluator, Amy Collier, had been earlier discharged as principal, but was then re-hired by Gloria Cortez.

29. In January 2006, upon Collier's negative evaluation, and in violation of all procedural rules, which require progressive discipline, I was required to be peer supervised, although I had many years of teaching experience with an unblemished record. This was entirely unfair and humiliating. Human Resources Assistant Superintendent Cortez and District Superintendent Kirschenbaum knew, ratified and/or directed the above.

30. I then filed a grievance with the District, protesting that the evaluation was completely improper and prevailed. The negative evaluation was withdrawn by Aguilar and Collier, undoubtedly with Gloria Cortez's grudging approval as Assistant Superintendent of Human Resources.

31. Also, at about that time, in January of 2006, I was then arbitrarily removed from the homeroom special program *which I had created* to help students improve their standardized testing placement.

32. By now, my work environment had become intolerable and I went out on a stress disability, as ordered by my physician. I returned for 3 weeks at the end of the semester in May, 2006. School was then out for the summer.

33. Classes resumed in early September 2006 and I returned.

34. On Friday, September 22, 2006, I was teaching my sixth grade class. One of my students, a small 10 year old girl, won a cross country championship. While standing in front of the entire class to celebrate her achievement, I innocently picked her up off the ground facing the class, raised her up in the air for a few seconds in a celebratory gesture and brought her back down. She

1       did not seem in any way upset by this.

2   35. Later that day, the student reported feeling uncomfortable about what I did.

3   36. Absolutely no touching of a sexual nature ever occurred in any of my classes.

4   37. I categorically state that the contact was celebratory and occurred in front of
5       the whole class. The student was not in any way vocalizing or demonstrating
6       any discomfort for the next two hours that she remained in my class.

7   38. Vice principal, Ms. Laura May, interviewed the student and determined there
8       was no misconduct. Mr. Sherman, the principal informed me that he agreed,
9       so I believed this was the end of this unfortunate misunderstanding.

10  39. Defendant Gloria Cortez did not conduct any investigation and admitted that
11      in her deposition testimony of May 22, 2009. She admitted that she has never
12      spoken to the student at any time! Cortez, deposition, 153:21 through 154:9.

13  40. On Monday, September 25, 2006, classes resumed normally with all students
14      present. A proctor was appointed to sit in my class. I then learned that the
15      incident of September 22, 2006 was not resolved.

16  41. On September 27, 2006, I received a letter stating that the District and law
17      enforcement were looking into criminal allegations of sexual misconduct
18      against me, I was placed on administrative leave and was barred from access
19      to District facilities.

20  42. No hearing was scheduled, nor was I provided a meeting at which I would have
21      the opportunity to confront my accuser(s). I remained on leave, as rumors
22      spread that I was "a molester".

23  43. On March 15, 2007 I was presented with a letter from defendant Gloria Cortez,
24      dated March 14, 2007, entitled "Notice of Unprofessional Conduct Education
25      Code Section 44938" referencing for the first time other instances of alleged
26      misconduct during the 2005-2006, 2006-2007 school years.

27  44. The letter belatedly and improperly[2] made accusations of unprofessional

28      _____
        [2]California Education Code § 44938 provides procedures, including time limits, for making
        accusations against a teacher. This was a statutory precursor to dismissal. *See,* Ed. Code § 44932.

                                         - 6 -

conduct against me during past years. These accusations were stale, vague as to any specific date of alleged offense, or the identify of the accuser(s) and I was hearing about them for the first time. These other unfounded, stale allegations were used to "boost" the current allegations pending against me, even though they were known to be false. If they were true, the Administration would have been obligated to act much earlier to remove him, but had not.

45.   This letter was extremely damaging and was a setup for dismissal.

46.   This Notice of "Unprofessional Conduct" limits me from obtaining other employment outside the District.

47.   According to the search warrant affidavit filed by Covina Detective Robert Bobkiewicz, on October 10, 2006 "I was contacted by Gloria Cortez, regarding the female student involved in the incident November 200_3_" (emphasis added.) Bobkiewicz states that Cortez states that the mother of the girl states that she now believes she should have believed her daughter. The purported incident never occurred and was investigated and deemed "unfounded" by Covina Officer Statler due to "false statements made by the student."   A true copy of the Bobkiewicz affidavit is submitted as Exhibit F.[3]

48.   At her May 22, 2009 deposition which I attended, defendant Cortez testified under oath that *during her investigation* of the subject incident, the prior purported incidents were revealed.   Cortez deposition, p. 108: 13–109:10. Further, she stated that she only contacted the police to determine if their investigation had concluded.

49.   Nearly four years later, on April 26, 2007 my then counsel, provided by the California Teacher's Association, posted a 10 page detailed response to defendant Gloria Cortez's March 14, 2007 letter objecting to the vague  and false accusations and the unfair delay in presenting them.

50.   The letter correctly noted that no complaint had been filed against plaintiff

---

[3]On May 22, 2009 defendant Gloria Cortez stated in deposition that she only called the Covina Police Department to determine if their investigation was concluded so that she could return Mr. Dougherty from paid administrative leave.

before and the "untimely use of this claim constitutes a violation of Article 23 of the Collective Bargaining Agreement (CBA) between the District and the Association." The letter of April 26, 2007, by plaintiff's counsel, demanded that the improper Notice of Unprofessional Conduct be Withdrawn from his personnel file and that no further disciplinary action be taken against plaintiff.

51.    Defendants failed and refused to withdraw the Notice and it remains there to this date. The letter containing grave falsehoods remains in my records as a defamatory purported fact.

52.    Based upon these reports, and an unfounded belief by officer Bobkiewicz that I might possess electronic child pornography, Covina Police Department sought and obtained and executed a search warrant at my residence, pointed guns at me and at my young son and seized my computers.

53.    Although I also had personal computers at school, these were not investigated.

54.    No evidence was found, and no charges were ever filed against me.

55.    Then, I was assigned to Bridges Community Day School, ("Bridges"), a school for juvenile delinquents, considered by most to be an undesirable placement.

56.    I did not consent to this assignment, which I believed to be punitive and retaliatory as the students are delinquent, troubled and violent.

57.    My reassignment to "alternative education" such as Bridges Community Day School violated the law, Education Code § 44865, which requires the teacher's consent, which I did not give. See Teacher Consent form, Exhibit H.

58.    Gloria Cortez, as Human Resources Superintendent, was responsible to assure compliance with protocol and procedures regarding teacher transfers and transferred me despite my lack of consent. Norman Kirschenbaum ratified this obviously improper transfer without exercising any independent judgment or taking any action independent from Gloria Cortez.

59.    I was subjected to repeated physical and verbal attacks at Bridges, where the students mocked me, threw objects at me in the classroom, hitting me in the

face with chalk and referred to me as a molester, vandalized my car and threatened me. Many are on juvenile probation and/or required to attend anger management courses. My car was "keyed" on the hood and the length of both sides, costing $2,600 to repair. Additionally, I have been repeatedly taunted with the epithet "molester."

59. I reported these scary, disturbing events to the police and I complained in writing to the administration, which failed to act on my behalf.

60. These damaging allegations caused permanent injury to my reputation and ongoing harm to my health, profession, and personal relationships. I continue to be under the care of a medical doctor and psychologist for depression, anxiety, post traumatic stress disorder and high blood pressure.

I declare the above to be true and correct under penalty of perjury under the laws of the United States. Dated: May 25, 2009.

BRUCE DOUGHERTY, declarant